

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00720-CV
No. 04-14-00724-CV

**THE STATE OF TEXAS FOR THE BEST INTEREST AND PROTECTION OF N.D.**

From the Probate Court No. 1, Bexar County, Texas
Trial Court Nos. 2014-MH-3263 & 2014-MH-3242
Honorable Polly Jackson Spencer, Judge Presiding[1]

Opinion by:     Sandee Bryan Marion, Chief Justice

Sitting:         Sandee Bryan Marion, Chief Justice
                 Karen Angelini, Justice
                 Luz Elena D. Chapa, Justice

Delivered and Filed: March 4, 2015

AFFIRMED

On September 30, 2014, having found that appellant was mentally ill and met the criteria for court-ordered temporary mental health services, the trial court ordered appellant to be temporarily committed for inpatient mental health services pursuant to section 574.034 of the Texas Health and Safety Code. By separate order, the court authorized treatment with psychoactive medication during appellant's temporary commitment. Appellant appeals from both orders, challenging the legal and factual sufficiency of the trial court's findings. We affirm.

---

[1] The Honorable Oscar Kazen conducted the hearings.

**STANDARD OF REVIEW**

To obtain either an order for temporary commitment or an order to administer psychoactive medication, the State must prove its case by clear and convincing evidence. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (West Supp. 2014), § 574.106(a-l) (West 2010). Because the State's burden of proof is clear and convincing evidence, we apply a heightened standard of review to sufficiency-of-the-evidence challenges. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). When reviewing the legal sufficiency of the evidence in a case requiring proof by clear and convincing evidence, we determine whether the evidence is such that a factfinder could reasonably form a "firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010) (quoting *Addington*, 588 S.W.2d at 570). We review all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *Id.* We resolve disputed fact questions in favor of the finding if a reasonable factfinder could have done so, and we disregard all contrary evidence unless a reasonable factfinder could not have done so. *Id.*; *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

Likewise, the higher burden of proof alters the appellate standard of factual-sufficiency review. *C.H.*, 89 S.W.3d at 25-26. In reviewing the evidence for factual sufficiency under the clear and convincing standard, we inquire "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *See id.* at 25. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In so doing, we must give "due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* We examine the entire record to determine

whether "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction"; if it is, the evidence is factually insufficient. *Id.*

## COMMITMENT ORDER

In its commitment order, the trial court found that appellant is mentally ill and is:

(i) suffering severe and abnormal mental, emotional, or physical distress;
(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and
(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

*See* TEX. HEALTH & SAFETY CODE § 574.034(a)(1) & (a)(2)(C).

"To be clear and convincing under Subsection (a), the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function." *Id.* § 574.034(d). Expert testimony recommending involuntary temporary commitment must be supported by a factual basis; "a bald diagnosis alone is insufficient to support commitment." *In re Breeden*, 4 S.W.3d 782, 784 (Tex. App.—San Antonio 1999, no pet.).

Here, the State sought the temporary commitment of appellant to University Hospital. At the hearing, the evidence presented consisted of the testimony of Dr. Kelin Ogburn, a psychiatrist with the hospital, and the testimony of appellant. Ogburn testified she was familiar with appellant and, based on her personal knowledge as well as appellant's history and medical records, Ogburn diagnosed appellant with schizo-affective disorder. She agreed this diagnosis was an illness, disease or condition that substantially impaired appellant's thought perception of reality, emotional process, or judgment. When asked what facts went into her diagnosis, Ogburn said appellant was

"quite paranoid, delusional, responding to internal stimuli, and her hyper-religiosity that makes her quite delusional." Ogburn said appellant was brought to the hospital after a CD caught fire when appellant lit a nearby candle. She said appellant assumed the fire was a mistake, but appellant's family was very concerned because the flame was big and appellant was in danger of setting the entire house on fire. As a result, appellant's sister had appellant admitted under a mental health warrant.

Ogburn also testified to other information contained in the mental health warrant that were of concern to appellant's family. Ogburn said appellant was not performing her "activities of daily living" at home, she had not been eating "for a while," she had been fasting extensively, she did not shower because she believes there are cameras in her shower and people are spying on her, she believes her brother-in-law is setting up cameras all over the house, and she punched holes in the walls because she believed she heard her former boyfriend's voice through the walls and she was trying to get rid of him. Ogburn said everything in the warrant was consistent with the psychosis portion of her diagnosis.

Ogburn testified that, while in the hospital, appellant needed a lot of encouragement at first to begin eating, but that has improved in the seven days since appellant was admitted. However, she believed appellant was eating because she was being supervised. Since being in the hospital, appellant has been polite, but not cooperative, during interviews, and appellant denies most of her problems. Ogburn said appellant told her there were cameras in the house, her brother-in-law had been spying on her, and she was hearing voices through the walls.[2] Ogburn said appellant was also breaking things with her own hands in an attempt to "just destroy property." Ogburn said

---

[2] At this point in Ogburn's testimony, appellant interjected, "No, I did not."

appellant was "extremely religious" to the point of being almost delusional, she believes she has a special relationship with Jesus, and she believes she can see Jesus' eyes moving on her icons.

Based on what she observed, Ogburn did not believe appellant could function independently because she would not eat or shower unless told to do so, she only showers in the dark because she believes there are cameras in the shower, she would not interact with anyone, and "she is always kind of by herself, talking to herself or praying or whatever she was doing in her room." Ogburn believed appellant's deterioration is exhibited by her inability, except for reasons of indigence, to provide for her own basic needs, including food, clothing, health and safety. Ogburn did not think appellant was capable of making rational and informed decisions about whether to submit to treatment, and her delusions indicate a "disconnect from reality." Ogburn said appellant's behavior had been progressively getting worse over the past nine years. She did not believe appellant had the ability to safeguard herself from various risks and dangers because "she is quite a calm person and maybe easy to manipulate in a way."

When asked whether she believed University Hospital is the least restrictive appropriate setting for appellant, Ogburn said she believed appellant needed a different place, somewhere she can stay for a prolonged period and be offered different services, for example, going outside. However, Ogburn agreed University Hospital was the least restrictive option for appellant. Ogburn admitted appellant had not threatened to hurt herself or expressed a suicidal tendency, and the only verbal altercation occurred when Ogburn told appellant she had to come to court. Ogburn said appellant has not manifested any behavior that she is likely to cause serious harm to others.

Next, appellant testified, first about the fire. Appellant explained she had two religious icons, one of which was on a CD cover and the other was made of paper. She also had two candles on a window sill: a beeswax in a glass candle holder and an olive oil candle with a cotton wick. She had slanted the glass candle holder sideways so she could burn incense on the glass. She said

she asked God's assistance in lighting the olive oil candle when the entire top surface of the candle started to burn. She said usually only the wick burns when the candle is lit. At some point, appellant left the room and when she returned, about fifteen minutes later, the CD cover was on fire. The fire spread and melted part of the encasement window. Appellant said the fire was an accident, she had never before started a fire by burning candles, and "it wasn't a house fire." However, appellant admitted that, at some point in the past, she had been burning a candle at her sister's house when the candle overheated, melted, and caused a countertop to "bubble up."

Appellant's testimony was often disjointed:

Q. Okay. I'm done talking about the fire so I'm going to go on to something else.
A. Which I had kept them, but my mother threw them away; I don't know where she put them.
Q. And how old is your mother?
A. And there was also a small — there were three small kind of cheap crosses. Those you get in the mail, I don't know from different places.
Q. Well, again, let's not talk about —
A. But they did not — this is part of the fire. They did not melt because they were right there.
Q. Okay.
A. But the heavier metal of the crank, the window crank, melted completely.
Q. Do you think that was God's touch, he saved the crosses but melted the metal, is that what you're saying?
A. Yeah, because those crosses were right there where all the rest of it was burning.

. . .

Q. . . . Can you tell me a little bit about the fasting that we heard about. What kind of fasting diet is it that you're on?
A. Usually it's Wednesdays or Fridays, but you can also fast on Monday too, if you want to. It's no meat, no dairy, no olive oil, no wine.
Q. And you do that every week?
A. No fish.
Q. How often do you fast?
A. Shellfish is ok.

Appellant denied hearing voices or punching holes in the walls, but she admitted showering in the dark for "privacy . . . [from] [s]urveillance cameras." Appellant said she was not compliant with taking her medication because she did not need the medicine.

On appeal, appellant asserts that because there was no eye-witness testimony about her punching holes in the walls, hearing voices, or details of the fire, there was no direct evidence of any overt act or continuing course of behavior upon which to conclude she was unable to function independently. Therefore, appellant argues the evidence is legally and factually insufficient to support the trial court's commitment order. We disagree.

As stated above, expert diagnosis alone is not sufficient to confine a patient for compulsory treatment, and the expert's opinion and recommendations must be supported by a showing of the factual basis on which they are grounded. *See In re Breeden*, 4 S.W.3d at 784. However, although the proof must be more than merely the greater weight of the credible evidence, there is no requirement the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570. Nor is there a requirement that the factual basis be direct evidence. *Lopez v. State*, 775 S.W.2d 857, 859 (Tex. App.—San Antonio 1989, no writ), *disapproved on other grounds*, *Campbell v. State*, 85 S.W.3d 176, 183 (Tex. 2002).

In addition to the medical records reviewed by Ogburn, the record reflects appellant admitted to showering in the dark because she believed surveillance cameras were present, she engaged in sometimes extensive fasting while on her own, while at the hospital she ate only when told to do so, she caused a fire at her home while her elderly mother was present, and she did not believe she needed medication. Although appellant disputed Ogburn's version of some of the underlying events, the trial court was the sole judge of credibility. On this record, we conclude the evidence is both legally and factually sufficient to support the trial court's commitment order.

### ADMINISTRATION OF PSYCHOACTIVE MEDICATIONS

"The court may issue an order authorizing the administration of one or more classes of psychoactive medication to a patient who . . . is under a court order to receive inpatient mental health services . . . ." *Id.* § 574.106(a)(1). Here, after issuing the commitment order, the trial court

held a hearing on and granted the State's application for an order to administer psychoactive medication. On appeal, the only basis on which appellant challenges the trial court's medication order is that the evidence is legally and factually insufficient to support the trial court's commitment order. Because we have determined the evidence is sufficient to support the trial court's commitment order, the evidence is also sufficient to support the trial court's order to compel psychoactive medications.

## CONCLUSION

We overrule appellant's issues on appeal and affirm the trial court's orders.

Sandee Bryan Marion, Chief Justice